UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROGERS ROBINSON | * | CIVIL ACTION NO. 21-885 |
| | * | |
| VERSUS | * | SECTION: "I"(1) |
| | * | |
| KILOLO KIJAKAZI, COMMISSIONER | * | JUDGE LANCE M. AFRICK |
| OF THE SOCIAL SECURITY | * | |
| ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Rogers Robinson, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits under Title II of the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be GRANTED; the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 15) be DENIED; and that the ALJ on remand be ordered (1) to further consider whether, in light of Mr. Robinson's 2013-2014 and 2017 medical records and his puzzling testimony about his travels, his gap in treatment might be reflective of his mental disorder, enlisting the assistance of a consultative examiner if appropriate, (2) to consider the possibility that Mr. Robinson's medical treatment after his date last insured could provide insight on his condition during the relevant period, (3) to attempt to obtain the Navos Seattle Mental Health records and, (4) if the ALJ determines another hearing is appropriate, to inquire further into the possibility of additional records between 2014 and 2017.

## **Procedural Background**

Mr. Robinson applied for disability insurance benefits on August 13, 2018, asserting a disability onset date of May 14, 2013. He alleged the following illnesses, injuries, or conditions: mood disorders, depression, and schizophrenia. On February 8, 2019, his claim was denied by the state agency. He requested reconsideration. Additional medical records were received, and the previous determination was found proper. It was noted that "[a]lthough you may suffer from depression and schizophrenia, there is insufficient evidence in the file to fully evaluate your condition prior to your date last insured of 12/31/2017." R. at 150.

Mr. Robinson requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 7, 2020. Mr. Robinson waived his right to counsel. At the hearing, he amended the alleged disability onset date to January 1, 2013. Following the hearing, the ALJ obtained additional medical records that had been discussed during the hearing. The ALJ also sent written interrogatories to a vocational expert, who replied in writing. On December 7, 2020, the ALJ issued an adverse decision. Mr. Robinson timely appealed to the Appeals Council, which denied review on April 1, 2021.

On May 3, 2021, Mr. Robinson filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 8, 9, 10). The parties filed cross-motions for summary judgment. (Rec. Docs. 14, 15). Mr. Robinson is proceeding *pro se*, without the assistance of counsel.

## **Evidence in the Record**

### *Hearing Testimony*

At the beginning of the hearing, the ALJ discussed Mr. Robinson's waiver of representation and underscored that representation is his right. R. at 104. She asked if he might want to take some

2

time to get a representative, noting that the representative could assist him in ensuring that all medical records had been obtained. R. at 104-05. But he declined. R. at 105.

As noted above, Mr. Robinson amended his alleged disability onset date from May 14, 2013, to January 1, 2013. R. at 105-06. The ALJ explained that Mr. Robinson was last insured through December 31, 2017, and because he had filed a Title II claim,[1] he had to be found disabled prior to that date to get benefits. R. at 106-07.

Mr. Robinson was 49 years old at the time of the hearing. R. at 107. He completed a master's degree in business in 1998. Id. He reported that he last worked in 2004 or 2005 as a financial analyst for Nissan or Infinity. R. at 108. He did internal controls, month end reporting, monthly management reports, and basic inputs of big shipments and cars coming through. R. at 109. When asked why he left the job, he explained "I felt like they were laughing at me, and I felt like they were going to set me up and try to get me --- I didn't think that far, but basically killed or setup in some type of illegal activity." R. at 109.

Mr. Robinson reported that he had been receiving Social Security disability benefits at that time, but he "was taken off" in 2012. Id. When asked why, he said:

> I'm not a rocket scientist so I can't really explain to you why, but I can come up with some theories here I've told myself several times. I was in Washington State – or Washington D.C. and I was looking for a job. I always look for jobs. And I was called from Social Security office to go to Baltimore, Maryland for a review. So, when I went there I was a bit –everything kind of went wrong, but I made it to the—I didn't like where I was in terms of the facility, it was kind of different for me.

---

[1] An individual is only entitled to disability insurance benefits under Title II if he is found to be under a disability during a period that he is "insured" under the Act. See 69 Am. Jur. Proof of Facts 3d 1 (Originally published in 2002). Insured status is based the individual's contribution to the Social Security trust fund through the Social Security tax on their earnings. See id. Title XVI provides supplemental security income to un-insured individuals who become disabled under the Act. See id. When applying for disability insurance benefits, Mr. Robinson reported that he had filed or intended to file a separate application for supplemental security income. R. at 191. It is unclear if he has done so.

R. at 110. The ALJ asked Mr. Robinson to focus on the answer. He continued "I guess I can tell you if you want a mathematical answer I don't know." Id. "The guy looked at me and just –he didn't do much with me and he kind of looked at me and said in his mind's mind that he's going to take me off and I swear to God I thought at this point I was going to find a job immediately." Id. Mr. Robinson added that "at that time I think I became really schizophrenic." R. at 110-11.

Mr. Robinson and the ALJ discussed whether there were any other medical records for the 2013 through 2017 period. R. at 113. The ALJ stated that Mr. Robinson's March 2017 treatment records from Chicago Read Mental Health Center would be ordered. Id. She pointed out the four year gap in treatment records. R. at 114. Mr. Robinson responded "[a] four-year gap is due to the fact that at this time all this stuff is speculation in my head, but I wasn't really in the country for those four years." Id. He said he was traveling and he "had a lot of countries getting mad at [him] because I probably was in a mental mindset, but they didn't necessarily kick me out or they necessarily didn't put me in a mental situation where I would have records." Id. But he stated that he believed that he "did leave a trail mix of discombobulated mental feelings from everybody in these countries I was visiting. Then they finally kicked me out and I came back here." R. at 115

Mr. Robinson stated that he came back to the United States in 2017 and was put "straight in the coocoo house." R. at 115. At first he agreed with the ALJ that he had been out of the country from 2013 through 2017, but then he said that he was in Seattle in 2014. R. at 115. "They made me stay there additional six months, and then I finally fled. I'm always thinking this country is trying to kill me. So I fled and I went to. . . I went to Denmark, I think." Id. He denied being hospitalized in Seattle in 2014. Id. He added, with reference to the "Chicago advocate date," that when he was in San Francisco he "freaked out" and tried to go to Canada. R. at 116. He continued:

> Canada stopped me at the border and say, you need to go back. So, the[y] flew me
> back to Seattle – I mean to – yeah they stopped me in Seattle. I said, I can't stop

> here right now, I'm coocoo, so they stopped me back in San Francisco. I got there and I thought those bums on the street was going to shoot me with needles and stuff and give me AIDS, so I went downtown to the police department there, I said I need a place to stay for a few days because I believe everybody is out to get me anywhere else.

R. at 116. He said he was made to call all the law enforcement agencies in the state, so he did and told them he had a problem. Id. Then he said "you guys are all out to get me." Id. So he booked a ticket to Chicago and "[i]n the morning the guy said, I believe you coocoo, so he called the policeman. The policeman brought me to the advocate which I wasn't aware of." R. at 116-17.

Mr. Robinson testified that he did drugs in 1998 and 1999, but he was not doing drugs in 2013, 2014, or 2015. R. at 117-18. He reported that he drank "on and off for several occasions, but in 2013 [he] wasn't labeled an alcoholic." R. at 118.

Mr. Robinson explained that he could not work during the relevant period because he was schizophrenic. R. at 119. He explained that he thought he could work in 2004, but he left because his "brain couldn't handle it." Id. He said he could do the actual work at times, but it was the other "stuff that deals with work, the culture of the company, getting to and from the company on time, being able to go home and not need to do seances to be ready for work the next day." R. at 119. He said considering all those factors he realized he had been dreaming about being able to work. Id. He wanted a job where he could just "live in [his] own box. If I have to step outside the box, some individuals does make me get paranoid." Id.

The ALJ asked Mr. Robinson how he supports himself. R. at 120. He said he came to Louisiana where his mother lives because he had no rent money. Id. But she "flipped out on [him] so she doesn't give [him] any money." Id. He gets $194 in food stamps. Id.

On a typical day he spends half the day just sitting around. Id. He tries to travel to the store because it makes him shave. Id. And on Friday and Saturday he walks around. Id.

Vocational expert Katrina Virden did not testify at the hearing, but instead responded to written interrogatories sent by the ALJ. The ALJ asked the vocational expert to consider a hypothetical individual born on September 21, 1970, with at least a high school education, Mr. Robinson's past work experience, and the residual functional capacity to perform the full range of work at all exertional levels but with the following non-exertional limitations:    simple directions/instructions/work-related decisions; routine workplace changes; no fast paced production requirements; no contact with the general public; and only occasional direct interaction with coworkers/supervisors. R. at 261. The vocational expert examined the evidence of Mr. Robinson's vocational background and responded that such a person could perform work as a dishwasher, Dictionary of Occupational Titles Number 318.617-010, medium exertion, unskilled with an SVP of 2, with 418,000 jobs available in the national economy; cleaner, custodian, medium exertion, unskilled with an SVP of 2, and 690,000 jobs available in the national economy, and stock clerk, retail laborer, medium exertion, unskilled with an SVP of 2, and 1.4 million jobs available in the national economy. R. at 262.

*Medical Records*

Mr. Robinson treated with Public Health Seattle & King County from November 2013 through January 2014. At his first visit on November 4, 2013, he complained of panic attacks, depression, and using alcohol (one bottle of vodka per day) and smoking to self-medicate. R. at 275. He had a PHQ9 score of 14 and a GAD 7 score of 15. R. at 275, 277. PHQ 9 scores of 10-14 are considered to reflect moderate depression.[2] A GAD 7 score of 15 is considered the threshold

---

[2] Kurt Kroenke, Robert L. Spitzer, Janet B.W. Williams, The PHQ-9 – Validity of a Brief Depression Severity Measure, J. Gen. Intern. Med. (Sept. 2001), available at Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited June 17, 2022).

between moderate and severe anxiety.[3] His affect was flat and he was able to focus for short periods of time. R. at 275. He reported barking at patients and people, but he spoke in a very comfortable manner. R. at 276. He reported depression for 20 years that had been worsening and difficulty getting medication. R. at 280. On a review of systems, low mood, low energy, and anxiety were noted. Id.  He had no suicidal or homicidal ideation. Id.  Dr. Laura Pence noted that he had established care for anxiety and depression, and he was started on  Zoloft. R. at 279.

He returned to Public Health Seattle & King County on December 19, 2013, and treated with Dr. Maureen Brown. R. at 272. He complained of constipation. Id.  Longstanding mental illness since at least 1999 was noted with at least one three-week hospitalization. R. at 272.  Dr. Brown noted this was complicated by ongoing alcohol abuse and past cocaine use. Id.  She noted that Mr. Robinson had some bizarre ideation and that his mental illness was "significantly impacting functional status." Id.  She noted that he needed a formal psychiatric assessment and that he had an intake appointment in three weeks through Navos Seattle Mental Health. Id.  On examination, Mr. Robinson's mood was anxious. Id.  He was very verbal/talkative. Id.  He had occasional bizarre ideation but no hallucination. Id. His insight was poor. Id. His judgment was fair to poor. Id.  He sought medication for depression. R. at 273. Although he did not report side effects from Sertraline, he reported it did not help at all. Id.  He reported taking Zoloft from 1999 through 2000, but it did not help much. Id.  He also reported taking Wellbutrin before, but reported that it "really alters [his] face." Id. He denied past suicidality and had no current suicidal ideation. Id. No friend or family support was identified. Id.  He reported he had been hospitalized once for

[3] Robert L. Spitzer, Kurt Kroenke, Janet B.W. Williams, A Brief Measure for Assessing Generalized Anxiety Disorder—The GAD-7, Arch Intern. Med. (2006), available at JAMA Network, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/410326 (last visited June 17, 2022).

more than 2 days and that he had mental illness since 2002 that he attributes to a history of cocaine use. Id.

Mr. Robinson followed up with Dr. Brown on January 2, 2014, for constipation. R. at 270. She noted there was no specific diagnosis yet, but Mr. Robinson displayed depression, anxiety, and some bizarre ideology especially about his health, complicated by current alcoholism and past heavy cocaine use. Id. On examination, he was neatly dressed and had a neutral mood. Id. His affect was a little blunted. Id. Bizarre ideas were noted for thought content. Id. His insight and judgment were poor. Id. He sought a refill of Zoloft. R. at 269. It was noted he had a mental health intake evaluation in mid-December and was waiting to hear back. R. at 271. It was also noted that "[h]e may get into regular mental health care through DSHS." Id.

Mr. Robinson returned to Public Health Seattle & King County on January 10, 2014. R. at 285. On mental status examination, he was slightly disheveled. Id. His mood was anxious and depressed, and his affect was expansive. Id. He denied suicidal or homicidal thoughts. Id. His speech was rapid and tangential. Id. Loose associations were noted for thought process and his thought content was grandiose and bizarre. Id. He denied hallucinations. Id. His cognition was within normal limits. Id. His judgment was suspect. Id. Mr. Robinson reported he had been a "traveler" for the last 14 years. Id. Prior to that he completed an undergraduate degree in finance and a master's degree in business. Id. He stated that things went well until he was 30 and his long term girlfriend broke up with him in 1998. Id. He started using alcohol and powder cocaine heavily and was eventually kicked out of the family home. Id. He endorsed heavy current alcohol use. Id. He reported last using cocaine 10 years earlier. Id. He reported inpatient treatment for a depressive episode between 1996-1999. Id. He reported that his current goal was to become a refugee from the USA. Id.

The Public Health Seattle & King County records contain a note dated January 21, 2014, that Mr. Robinson cancelled all future appointments. R. at 284. It was noted that his current contact information is not valid. Id.  There are no other treatment records from the 2013-2014 time period and no other treatment records at all until March 2017 when Mr. Robinson was brought to an emergency room in Chicago and involuntarily committed for a week.

Mr. Robinson was brought to the emergency department at the Illinois Masonic Medical Center on March 13, 2017, by ambulance. R. at 456, 468. He reported that he had called police to pick him up because he was feeling uncomfortable with his roommate at the hostel where he was living and feeling unsafe in the United States. R. at 468. During his intake assessment by Licensed Clinical Professional Counselor Rasa Ciceniene, the following functional impairments were noted: serious impairment in social, occupational, or school functioning; unemployed or working part-time due to mental illness and not for reasons of physical disability or some other role responsibility (e.g., student or primary caregiver for dependent family member); is employed in a sheltered setting or supportive work situation; or has markedly limited work skills; requires help to seek public financial assistance for out-of-hospital maintenance; and does not seek appropriate supportive community services without assistance. R. at 300. It was noted that Mr. Robinson had a history of using psychotropic medication management over a one-year period, either continuously or intermittently. R. at 301. The emergency room recommended further evaluation for psychosis, and he was transferred to the Chicago Read Mental Health Center. Id.

On admission at Chicago Read, Mr. Robinson was disorganized and hyperverbal. Id.  He had paranoid delusions—he reported that he did not feel safe in the United States because there are enemies of the state and organizations that do not want him here. R. at 482. But he was generally cooperative during his stay and agreeable to medication. R. at 469. He was started on

9

Olanzapine and Depakote for psychosis and mood stability, and he was given Benadryl and Clonazepam for sleep and anxiety. R. at 471. He became less disorganized and paranoid with medication. Id.  On March 14, 2021, his mood was "okay," his affect was suspicious, his cognition and comprehension were good, and his insight and judgment were poor. R. at 482-83. On March 15, 2017, he had a fair mood, appropriate affect, marginal insight and judgment, and persecutory delusions and paranoid ideas. R. at 518. He was discharged on March 21, 2017, because he did not meet the criteria for continued involuntary commitment. R. at 472. Although he was advised to stay in the hospital a bit longer, he would not rescind his five day discharge request. R. at 474. On discharge, his mood was bright and he was looking forward to traveling[4] to Denmark. R. at 472. He reported having a flight scheduled for the next day. R. at 522. Psychotic symptomology was listed as an active problem at the time of discharge. R. at 474.

Approximately two months later in July 2017, Mr. Robinson was brought to the Mount Sinai Medical Center emergency department in Florida by police for acute psychosis with unknown onset, severity, and associated factors. R. at 303.  The police reported Mr. Robinson was standing on the street staring at a light pole and talking to it. Id.  He became agitated when confronted by the police. Id.  Mr. Robinson denied alcohol or substance use. Id. On a review of systems, Mr. Robinson was positive for agitation and negative for suicidal ideas. R. at 304. On examination, his speech was rapid and/or pressured and tangential; he was hyperactive; and he had tangential thought process. Id.  He would alternate speaking with an American and English accent. Id. The primary encounter diagnoses was depression and acute psychosis. R. at 307. He was admitted for psychiatric evaluation. Id.

---

[4] He reported being in San Francisco 3-4 weeks before Chicago, Amsterdam before that, London for three months before that, and Australia before that. R. at 480. He also reported having been in Vancouver but said he was sent back to the United States. Id.

On the same day, he had a consultation with Dr. Yanko Enamorado for "[o]ther Bizarre behavior." R. at 308. Dr. Enamorado noted that on current evaluation, Mr. Robinson was slightly circumstantial but overall coherent. Id.  Mr. Robinson denied hallucinations, paranoia, or suicidal or homicidal thoughts. Id.  He explained that he felt prejudiced when approached by police. Id.  A mental status exam was performed. R. at 309. Mr. Robinson had fair eye contact; his insight and judgment were decreased; his knowledge base was normal; his language was fluent and spontaneous without dysarthric features; his recent and remote memory were fair; his affect was constricted; he was alert, oriented, and cooperative; and his thought content exhibited circumstantial and logical connections. Id. Dr. Enamorado concluded that Mr. Robinson was alert, present and future oriented, aware of events, knew the consequences of his actions, and did not meet the psychiatric hospitalization criteria. R. at 310.

*Records Dated after Mr. Robinson's Date Last Insured*

The next medical record is a discharge notice dated almost one year later from Central and North West London Foundation Trust, which reflects that Mr. Robinson was admitted from June 28, 2018, through July 28, 2018, for manic presentation of bipolar illness. R. at 314. He was discharged with a 14 day supply of Amisulpride. R. at 315.

Almost a year passed before the next medical record dated July 10, 2019, from Daughters of Charity where Mr. Robinson went to establish a primary care practitioner. R. at 393. He complained of chronic back pain and mental issues. Id.  A history of schizophrenia, depression, insomnia, and nervousness were noted. Id.  Dr. Daniel Bouchette made the following assessments: lumbago, schizophrenia, and body mass index. R. at 395.

On July 30, 2019, Mr. Robinson presented at the New Orleans East Behavioral Health Center with major symptoms, difficulties, and/or issues with behavioral health. R. at 333. He

reported a loss of motivation and homelessness. Id.  He reported feeling miserable, experiencing disruptive sleep, overeating, experiencing paranoia and feeling that people are plotting against him and like a director in the movie of his life, and experiencing racing unpleasant thoughts and hopelessness. Id.  He said he thought his whole life was out of balance and he wished he was someone else. R. at 336. He reported living at home with his mom for the past ten months. Id.  His risk of harm was noted to be low, his functional status was rated as moderately impaired, and co-morbidities were found to be minor. R. at 338. It was noted that he had ongoing and/or variably severe deficits in interpersonal relationships, ability to engage in socially constructive activities, and ability to maintain responsibilities. Id.

On mental status examination, his appearance was average, he was oriented and alert with fair eye contact. Id. His affect was flat and his mood was depressed. Id. His speech was slow. Id. He was cooperative. Id. No risk of harm was noted. R. at 340. His thought process and associations were logical. Id.  His thought content was helpless/hopeless. Id. His memory, intellect, insight, and judgment were good. Id.  In assessment of risk of harm to others, psychosis/command hallucinations were noted. R. at 341. He was diagnosed with severe major depressive disorder, recurrent episode, and  outpatient therapy and medication management was recommended. R. at 342.

Mr. Robinson returned to the New Orleans East Behavioral Health Center on August 2, 2019, and was seen by Minati Biswas. R. at 356. He reported being sad and moody and having disturbed sleep. Id.  He felt paranoid and that someone was plotting against him. Id. He felt grandiose and was having racing, unpleasant thoughts. Id.  On mental status examination his appearance was average, he was oriented, and he had fair eye contact. R. at 357. His affect was labile and his mood was depressed, anxious, guarded, and irritable. Id. His speech was rapid and

pressured. Id.  He was cooperative and no risk of harm was noted. Id.  His associations were occasionally loose. Id.  His thought process stream was circumstantial. Id.  His thought content was paranoid, helpless/hopeless, and had ideas of reference. R. at 358. He reported visual hallucinations. Id.  His concentration, memory, intellect, insight, and judgment were fair. Id.  He was prescribed Seroquel, Prozac, and gabapentin. R. at 359.

Mr. Robinson followed up with Dr. Centanni at Daughters of Charity on August 29, 2019, with complaints of panic attacks. R. at 375.

Mr. Robinson returned to the New Orleans East Behavioral Health Center in October 2019 and was seen by Marchant Van Gerpen. R. at 344. On mental status examination, his appearance was good, he was oriented and alert and his eye contact was fair. R. at 345. He was hypoactive with a constricted affect and anxious and depressed mood. R. at 345-46. His speech was soft, slow, and monotone. R. at 346. He was cooperative and no risk of harm was noted. Id.  His thought process and associations were logical. Id.  His thought content was paranoid. Id.  His concentration, memory, intellect, and judgment were good. Id.  His insight was fair. Id.  He was diagnosed with major depressive disorder with psychotic features, unspecified bipolar and related disorder, severe alcohol use disorder (though he reported he had stopped drinking alcohol in December 2017), and moderate cannabis use disorder. R. at 347. Outpatient services were recommended. R. at 348.

Mr. Robinson returned to Van Gerpen in November 2019. R. at 350. He was anxious and somatic. Id.  He reported that Trileptal makes him a little "wired," so they decided to switch to him taking it at lunch. Id.  He reported that he felt it had blunted his anger somewhat. Id.  His mood was 3/10, anxiety was 5-8/10, and he had no hallucinations in the preceding 3 weeks. Id.  He was paranoid and felt constantly that the world was out to get him/condemn him/destroy him,  so he was constantly analyzing and trying to figure out how to stay alive. Id.  He complained of some

odd/bizarre beliefs about past and future. Id.  On mental status examination, his appearance was good, he was oriented and alert, and his eye contact was poor. Id.  His affect was constricted and his mood was depressed and anxious. R. at 352. His speech was verbose. Id.  His thought processes and associations were occasionally loose. Id.  His thought process stream was circumstantial, and his thought content was paranoid. Id.  His concentration, memory, and judgment were fair, his intellect was good, and his insight was poor. Id.

Mr. Robinson also began treating at LCMC Health University Medical Center in New Orleans in July 2019. Over the next few months he presented with complaints of back pain and constipation. R. at 430-46.

Mr. Robinson also began treating with DePaul Community Centers in July 2019. R. at 58. He presented for back and abdominal pain, heel pain, diabetes, fluctuating blood pressure, and wellness visits, through December 2020. R. at 29-58. Of relevance to his complaints of mental health issues, Mr. Robinson was noted to be "very confused" on March 3, 2020, and reported that he had not been going to psychiatry. R. at 45. He was seen by Licensed Clinical Social Worker Dontrell Turner the same day. R. at 43. Mr. Robinson presented with disorganized thoughts, he was tangential, and he had fixed delusions. Id. He was cooperative and pleasant. Id.  He reported receiving mental health services with Metropolitan Human Services District but had not seen his therapist in some time. Id.  It was noted that a medication management follow up with Metropolitan was scheduled for March 10, 2020, and that counselor reassignment was pending there. Id.

### Decision of the Administrative Law Judge

The ALJ found that Mr. Robinson last met the insured status requirements of the Act on December 31, 2017. The ALJ found that Mr. Robinson had not engaged in substantial gainful

activity during the period from his alleged disability onset date of January 1, 2013, through his date last insured of December 31, 2017.

The ALJ determined that Mr. Robinson has the following severe impairments: schizophrenia and bipolar disorder. But the ALJ found that Mr. Robinson did not have an impairment or combination of impairments that meets or medically equals the severity of one the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. To reach this conclusion, the ALJ considered the severity of Mr. Robinson's mental impairments under both the "paragraph B" and "paragraph C" criteria of listings 12.04 and 12.06.

The ALJ next found that through his date last insured, Mr. Robinson had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:  simple directions/instructions/work-related decisions; no fast-paced production requirements; routine workplace changes; no contact with the general public; and only occasional direct interaction with coworkers/supervisors. In making this determination, the ALJ considered and discussed medical evidence dated through July 2017. The ALJ noted that there was additional evidence "but such was for the claimant's condition well after the date last insured."

The ALJ then determined that Mr. Robinson has no past relevant work. The ALJ determined that on the date last insured, Mr. Robinson was 47 years old, which is defined as a "younger individual" under the regulations. The ALJ found that Mr. Robinson has at least a high school education. Relying on the vocational expert's testimony, the ALJ then determined that through the date last insured and considering Mr. Robinson's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Mr. Robinson could have performed. The ALJ therefore concluded that Mr.

Robinson was not under a disability as defined in the Act at any time from the amended alleged onset date of January 1, 2013, to the date last insured of December 31, 2017.

**Analysis**

### I. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

**III.    Plaintiff's Appeal**.

*a. Parties' Arguments*

Construing Mr. Robinson's pro se complaint liberally, he essentially argues that the ALJ's decision is not supported by substantial evidence and that the ALJ failed to develop the record because no consultative examination was ordered and he was not given enough time to obtain medical records.

Mr. Robinson argues that his medical records are incomplete at best and not truly accurate. He submits that he was not brought to the hospital every time he had a mental health episode. He adds that he did not check himself into a mental health institution for various reasons, including fear of being forcibly admitted to a psychiatric hospital. He further argues that his schizophrenia is also a major reason why he avoided getting medical help. He says he is certain he was mentally ill and suffering from depression from 2013 until 2018, but "he did believe he was strong enough to return to work and world leaders were there to provide him with references." Therefore, he did not check himself into a hospital. But he says that after 2018, he determined that the SSA was the only organization that could help him and he realized he should have contacted medical services several years earlier. He submits that his schizophrenia has left him further depressed and believing in false gods and that he has severe memory loss. Mr. Robinson complains that the ALJ did not hire an expert witness in mental disorders to evaluate him and corroborate his theory about why he did not behave properly between 2013 and 2017.

The Commissioner responds that there is no dispute that the ALJ considered Mr. Robinson's medical records during the relevant period. The Commissioner argues that Mr. Robinson cannot show prejudice resulting from the lack of a medical expert. She points out that ALJs have the discretion to decide whether to consult a medical expert and was not required to do

so here. The Commissioner insists that the ALJ met her duty to assess the evidence and properly exercised her discretion.

Mr. Robinson also complains that SSA did not follow procedures in collecting evidence and failed to give him enough time to obtain medical records. He complains that the SSA just looked at the evidence in the record and did not follow through in requesting additional evidence. He submits that he was brought to the hospital for mental health issues twice in 2017. He argues that two times is a lot.

The Commissioner responds that the ALJ offered Mr. Robinson additional time and opportunity during his hearing and by letter. A record from 2020 arrived, but the relevant time frame had ended December 31, 2017. He did not submit any new evidence to the Appeals Council. The Commissioner argues that there is no indication that any other medical records from the relevant time frame exist.

The Commissioner points out that when Mr. Robinson alerted the ALJ at the hearing that there was a March 2017 record from the Chicago Read Mental Health Center outstanding, the ALJ wrote to this provider to request the medical documentation. The provider sent medical records that were admitted as an exhibit to Mr. Robinson's file. The Commissioner argues that the Chicago Read Mental Records show no signs that Mr. Robinson was functionally limited.

   b. *Analysis*

The ALJ has a duty to "develop the facts fully and fairly" relating to an applicant's claim for disability benefits. Ripley, 67 F.3d at 557 (5th Cir. 1995); Thorton v. Schweiker, 663 F.2d 1312, 1316 (5th Cir. 1981) ("[T]he ALJ has a special responsibility to develop a full and fair record upon which to base his decision."). Where the record is ambiguous or incomplete, the ALJ should inquire further by requesting a medical source statement, subpoenaing the claimant's physician, or

holding a second hearing. See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001); Ripley, 67 F.3d at 557; Cintron v. Bowen, 686 F. Supp. 522, 524 (E.D. Pa. 1988) ("If the ALJ believes claimant's evidence was unclear or inclusive [sic], the ALJ should secure evidence needed to make this determination."). Thus, Social Security Ruling 16-3p instructs that a variety of means are available to develop an insufficient record, including obtaining additional evidence from the individual about the nature of his symptoms and the effect on functioning, requesting additional information from the individual about testing or treatment, requesting clarifying information from the medical sources, or sending the individual to a consultative examination. SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017). Of note, no one of these options is required. Indeed, the Fifth Circuit has held that the ALJ is not required to order a consultative examination "unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision." Ford v. Sec'y of Health & Hum. Servs., 659 F.2d 66, 69 (5th Cir. 1981); see White v. Soc. Sec. Admin., 129 F. App'x 905, 906 (5th Cir. 2005) (holding that where the medical record is sufficiently developed, the ALJ is not required to obtain additional medical expert testimony). Further, the claimant is only entitled to reversal if the ALJ's failure to satisfy the duty to develop the record results in prejudice to the claimant. Ripley, 67 F.3d at 557.

Here, the medical records during the relevant period (that is, January 2013 through December 2017) are sparse, yet they clearly show Mr. Robinson's mental impairments. The self-report scales (PHQ-9 and GAD-7) completed by Mr. Robinson in November 2013 indicate that his depression and anxiety were moderate to severe. R. at 276-77. He was prescribed Zoloft, yet about six weeks later in December 2013, the treating physician noted that Mr. Robinson's mental illness was significantly impacting his functional status. R. at 272. He had some bizarre ideation, rapid and tangential speech, and poor insight and judgment in December 2013. R. at 272. Again

on January 2, 2014, bizarre ideas were noted. R. at 270. On January 10, 2014, loose associations and grandiose/bizarre though content were noted and his judgment was suspect. R. at 285. He reported he had been a "traveler" for the last 14 years. Id. He reported he had an intake appointment for mental health treatment with Navos Seattle Mental Health, but it is unclear whether the ALJ attempted to obtain these records.  On January 21, 2014, Mr. Robinson abruptly cancelled all future appointments.

For more than three years after this, Mr. Robinson did not receive any mental health treatment. Although the ALJ is "not precluded from considering the lack of treatment as an indication of nondisability," Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990), the court finds that the evidence of record mandates further inquiry. The records both before and after the gap in treatment establish that Mr. Robinson suffered from mental illness. When asked to explain the gap in treatment, Mr. Robinson gave the ALJ a confusing response: "[a] four-year gap is due to the fact that at this time all this stuff is speculation in my head, but I wasn't really in the country for those four years." Id.  He said he was traveling and he "had a lot of countries getting mad at [him] because I probably was in a mental mindset, but they didn't necessarily kick me out or they necessarily didn't put me in a mental situation where I would have records." Id.  But he stated that he believed that he "did leave a trail mix of discombobulated mental feelings from everybody in these countries I was visiting. Then they finally kicked me out and I came back here." R. at 115. Mr. Robinson also testified with regard to his time in Seattle in 2014 that "[t]hey made me stay there additional six months, and then I finally fled. I'm always thinking this country is trying to kill me. So I fled and I went to. . . I went to Denmark, I think." Id.  He also testified that he tried to go to Canada after he "freaked out" in San Francisco and then provided the following puzzling account.

Canada stopped me at the border and say, you need to go back. So, the[y] flew me back to Seattle – I mean to – yeah they stopped me in Seattle. I said, I can't stop here right now, I'm coocoo, so they stopped me back in San Francisco. I got there and I thought those bums on the street was going to shoot me with needles and stuff and give me AIDS, so I went downtown to the police department there, I said I need a place to stay for a few days because I believe everybody is out to get me anywhere else.

R. at 116. The ALJ interpreted this testimony about Mr. Robinson's travels as evidence that his functionality was not as limited as he claims, summarizing merely "the record shows the claimant could travel around the country and internationally, where he could live in hotels" and "the claimant stated he has travelled and lived in many different cities around the country." R. at 17. The ALJ's assessment does not square with the actual testimony. Indeed, Mr. Robinson argues that his schizophrenia and fear of hospitalization explains why he did not seek treatment. This seems a more likely explanation, yet the ALJ failed to even consider the possibility that the gap in treatment is a further symptom of Mr. Robinson's impairment. The ALJ declined to request that a psychiatrist review the medical records and examine Mr. Robinson to determine whether this could be so.

The next medical record shows that Mr. Robinson was admitted to a mental health center in Chicago in March 2017—where he was committed for a week after calling police to pick him up from the hostel where he was staying because he felt unsafe. At the time of admission, it was noted that he had a serious impairment in social, occupational, or school functioning and that he was unemployed or working part-time due to mental illness. R. at 300. It was noted that Mr. Robinson does not seek appropriate supportive community services without assistance. Id.  He was hyperverbal and had persecutory and paranoid delusions during his stay. R. at 301, 482, 518. His insight and judgment were poor. R. at 482-84. Although he also improved with medication and was generally cooperative and agreeable during his stay, when he no longer met the criteria for

22

involuntary commitment, he was advised to stay in the hospital a bit longer. R. at 469, 471, 474. He refused, citing planned to travel to Denmark. R. at 472.

Four months later he was again taken to the emergency department by police–this time in Florida—for acute psychosis. R. at 303. He was agitated with rapid and/or pressured speech. R. at 304. The police reported he had been standing on the street staring at a light pole and talking to it and became agitated when confronted by police. R. at 303. His speech was rapid and/or pressured and tangential, he was hyperactive, and he had tangential thought process. R. at 304. He would alternate speaking with an American and English accent. Id. He was then examined by Dr. Enamorado who noted a different presentation: that Mr. Robinson was cooperative, did not require medication, that he was knew the consequences of his actions, and that his thought content exhibited circumstantial and logical connections. R. at 309-10.

Records dated after Mr. Robinson's date last insured were not considered by the ALJ. Although Mr. Robinson must establish disability before the date last insured for an award of disability insurance benefits, his post date-last-insured records may provide insight into his condition during the relevant period. See Likes v. Callahan, 112 F.3d 189, 191 (5th Cir. 1997) (holding that the ALJ must consider retrospective medical diagnoses when corroborated by lay evidence relating back to the claimed period of disability, even if it is not also corroborated by contemporaneous medical reports); see also Bird v. Comm'r of the Soc. Sec. Admin, 699 F.3d 337, 340–41 (4th Cir. 2012) (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)) (holding that where medical evidence dated after the DLI is "reflective of a possible earlier and progressive degeneration," it should be considered by the ALJ). The ALJ did not consider whether the post date-last-insured records could assist in this regard, nor did she ask a consultative psychiatrist to assess this possibility.

Yet these records show that less than a year after his July 2017 hospitalization, Mr. Robinson was hospitalized for a month at the Central and North West London Foundation trust for manic presentation of bipolar illness. R. at 314. He was discharged on July 28, 2018. Id.  Another year later, he presented at the New Orleans Behavioral Health Center with major symptoms, difficulties, and/or issues with behavioral health. R. at 333. He was paranoid, he felt that people were plotting against him, and he had racing and unpleasant thoughts and hopelessness. Id.  His functional status was rated as moderately impaired. R. at 338. He presented again on August 2, 2019, with paranoid and grandiose thoughts, rapid and pressured speech, and with visual hallucinations. R. at 356-59. On August 29, 2019, he presented with complaints of panic attacks. R. at 375. His thought content remained paranoid with anxious and depressed mood in October and November 2019, though he was oriented and alert. R. at 344-46, 350-52. In March 2020 when treating for physical pain, it was noted that he was very confused and that he had not been going to psychiatry. R. at 45.

After reviewing the medical records through 2017, the gap in treatment, and Mr. Robinson's testimony, the ALJ determined that  during the relevant period, Mr. Robinson had the residual functional capacity to perform work at all exertional levels, but limited to work with simple directions/instructions/work-related decisions; no fast paced production requirements; routine workplace changes; no contact with the general public; and occasional direct interaction with coworkers/supervisors. The ALJ concluded that further development of the record was not necessary.

The court disagrees. The record should have been further developed because presently, substantial evidence does not support the ALJ's decision. Mr. Robinson argues that the ALJ should have retained a medical expert to evaluate him and his medical records to determine why he did

not "behave properly" between 2013 and 2017. Not only is Mr. Robinson referring to mental health conditions and episodes for which he received treatment but also his failure to seek treatment in that time frame. The court agrees with Mr. Robinson's contention that two hospitalizations for psychosis over a period of five months in 2017 is "a lot." This evidence merits further development of the record and cannot be glossed over by Mr. Robinson's perplexing testimony about his "travels" between 2014 and 2017. Considering the mental health symptomology reflected in the medical records from 2013-2014 and 2017-2020 as well as Mr. Robinson's tangential explanation for the gap in treatment—a symptom of the very disease that he claims prevents him from working—the services of a mental health expert could have provided some insight as to Mr. Robinson's three year gap in treatment.[5] Instead, the ALJ cited the most positive notes from his mental health treatment and relied on his testimony about his "travels" as evidence of his ability to function. The ALJ ignored the possibility that the gap in treatment might be due to his mental disorder. The ALJ also failed to consider that Mr. Robinson's post-date-last-insured medical records might bear on his condition during the relevant period. The ALJ did not track down the Navos Seattle Mental Health records. Although the ALJ included some limitations to reflect Mr. Robinson's mental condition, the court cannot find that the ALJ's residual functional capacity assessment is supported by substantial evidence.

## **RECOMMENDATION**

Accordingly and for the foregoing reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be GRANTED; the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 15) be DENIED; and that the ALJ on remand be

---

[5] The state agency reviewing psychologist/psychiatrist discussed Mr. Robinson's 2017 treatment records and determined that there was insufficient evidence to assess functional capacity prior to the date last insured. R. at 140. It appears that the 2018-2019 records were not considered.

ordered (1) to further consider whether, in light of Mr. Robinson's 2013-2014 and 2017 medical records and his puzzling testimony about his travels, his gap in treatment might be reflective of his mental disorder, enlisting the assistance of a consultative examiner if appropriate, (2) to consider the possibility that Mr. Robinson's medical treatment after his date last insured could provide insight on his condition during the relevant period, (3) to attempt to obtain the Navos Seattle Mental Health records and, (4) if the ALJ determines another hearing is appropriate, to inquire further into the possibility of additional records between 2014 and 2017.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 21st day of June, 2022.

Janis van Meerveld
United States Magistrate Judge

26